# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

Nº 09-CV-2101 (JFB) (ETB)

———————————————

ANNE KELLY AND CHRISTINE LOFARO,

Plaintiff,

VERSUS

HUNTINGTON UNION FREE SCHOOL DISTRICT AND HUNTINGTON UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION,

Defendants.

———————————————

**MEMORANDUM AND ORDER**
March 30, 2012

———————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Anne Kelly[1] ("Kelly" or "plaintiff") brought this civil rights action against her employer, the Huntington Union Free School District (the "District") and the Huntington Union Free School District Board of Educators (the "Board"), (collectively, the "defendants"), pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging that defendants violated plaintiff's rights under the First Amendment. Specifically, plaintiff, who is an elementary school teacher, alleges that defendants retaliated against her for engaging in various forms of protected speech. The defendants now move

for summary judgment. For the reasons set forth below, the motion is granted in its entirety.

## I.    BACKGROUND

### A.    THE FACTS

The facts, construed in the light most favorable to plaintiff, the non-moving party, *see Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005), are as follows:

#### 1.    The Search Program

Plaintiff is a former teacher for the defendants. (Defs.' 56.1 Statement ¶ 1.)[2]

---

[1] On March 26, 2010, plaintiff Christine LoFaro and the defendants entered into a stipulation of partial dismissal. Accordingly, Christine LoFaro is no longer a party in this action.

[2] Where one party's 56.1 Statement is cited, the other party does not dispute the facts alleged, unless otherwise stated. In addition, although the parties'

The District offers a program for its academically talented students called the Scholastic Enrichment and Resource for Children in Huntington ("SEARCH"). (*Id.* ¶ 5.) Plaintiff has been a SEARCH teacher since approximately 1990, and had been an elementary school teacher for approximately 30 years. (*Id.* ¶¶ 9, 10.) Defendants contend that, prior to working as a SEARCH teacher Kelly taught kindergarten, first, third and fourth grades, while plaintiff contends that she taught first, third and fifth grade classes. (*Id.* ¶ 11; Pl.'s Counter 56.1 Statement ¶ 11.) Plaintiff also taught Title I reading, Title I math and worked with blind students prior to becoming a teacher in the SEARCH program. (Defs.' 56.1 Statement ¶ 12.) Kelly did not receive "specific" training in "gifted education" but received a certification as a result of being grandfathered in for working a certain number of years. (*Id.* ¶ 17; Pl.'s Counter 56.1 Statement ¶ 17.1.)

In addition to being a teacher in the SEARCH program, Maryann Daly ("Daly") was the Coordinator of the SEARCH program from 1995 through 2006, and became the Chairperson of the program in 2007. (Defs.' 56.1 Statement ¶¶ 18, 19, 23.) As Chairperson, Daly was in charge of the entire SEARCH program, including, but not limited to, testing, evaluations, the selection process, field trips, activities, obtaining grants and funding, and curriculum. (*Id.* ¶¶ 22, 26, 27, 28.)[3] Accordingly, Daly was

plaintiff's boss, plaintiff reported directly to Daly, and Daly supervised and evaluated plaintiff. (*Id.* ¶¶ 25, 26, 27, 28.) Daly reported directly to the District's Assistant Superintendent. (*Id.* ¶ 29.) During the 2008-2009 school year, there were 2.5 teachers in the SEARCH program. (*Id.* ¶ 30.) Plaintiff and Daly had conflicting views regarding how the SEARCH program could be improved, and this disagreement caused tension between the plaintiff and Daly throughout the years. (*Id.* ¶¶ 36, 39.)

2.  Plaintiff's Three Complaints About Daly[4]

___

of her position as Chairperson. (Pl.'s Counter 56.1 Statement ¶ 22.)

[4] In addition to the three complaints by plaintiff about Daly detailed *infra*, plaintiff also had other complaints about Daly that are outlined in the parties' 56.1 Statements, including the following: Daly changed plaintiff's computer password in December 2006 (Defs.' 56.1 Statement ¶¶ 120-139); Daly observed plaintiff in January 2008 (*Id.* ¶¶ 141-158); Daly ordered a new StarLab (*Id.* ¶¶ 161-169); Daly disagreed with plaintiff over the transportation of students (*Id.* ¶¶ 170-178); Daly contacted News 12 to Film the Students in spring of 2006 (*Id.* ¶¶ 179-189); Daly changed plaintiff's schedule in 2006 and 2007 (*Id.* ¶¶ 190-199); the SEARCH website mentioned Daly more than plaintiff (*Id.* ¶¶ 200-206); Daly told plaintiff the wrong time for a meeting in November 2007 (*Id.* ¶¶ 205-204); Daly created a new form for a second grade program in December 2007 (*Id.* ¶¶ 207-213); plaintiff was required to obtain Daly's approval to participate in a videoconference with NASA in October 2008 (*Id.* ¶¶ 214-224); Daly disagreed with plaintiff over the SEARCH curriculum (*Id.* ¶¶ 226-240); and Daly and Kelly disagreed over a PTA survey and plaintiff responded in February 2009. (*Id.* ¶¶ 244-264.) Defendants argue that none of the above-mentioned incidents amounted to private speech regarding a matter of public concern, and plaintiff did not suffer an adverse action that is causally connected to her speech. However, plaintiff's counsel has made it clear that these other complaints are not part of Kelly's First Amendment claims in this case. Specifically, in plaintiff's memorandum in opposition to the motion for summary judgment, plaintiff's counsel states that "[a]lthough Defendants devote a substantial amount of time to minor complaints in an effort to distract the

___

Rule 56.1 statements contain specific citations to the record to support their statements, the Court has cited to the Rule 56.1 Statements, rather than the underlying citation to the record, when utilizing the 56.1 Statements for purposes of this summary of facts.
[3] Defendants believe that Daly's duties were a result of her position as both the Coordinator and Chairperson of the SEARCH program. (Defs.' 56.1 Statement ¶ 22.) Plaintiff agrees that Daly had these responsibilities but believes they were only as a result

a. Daly Overbooked Schooner Ship Field Trip in 2005

In May 2005, the SEARCH students had a field trip aboard a schooner ship that was organized by Daly every year. (*Id.* ¶¶ 40, 41.) Plaintiff and LoFaro were scheduled to accompany 56 students aboard the ship. (*Id.* ¶¶ 43, 44.) However, because the trip was overbooked, the ship could not accommodate everyone, so LoFaro and plaintiff did not board the ship. (*Id.* ¶¶ 46, 47.) Daly was the only teacher that boarded the ship, but not the only adult. (*Id.* ¶¶ 46, 50, 51, 52.) Defendants contend that plaintiff was upset because she was unable to go on the trip with her students. (*Id.* ¶ 55.) However, plaintiff asserts that she was also upset because it negatively affected her ability to give a follow-up lesson, it may have violated district policy regarding student-teacher ratio for field trips, she had no way of knowing whether being left behind endangered the safety of her students, and ultimately she would be responsible for the safety of her students. (Pl.'s Counter 56.1 Statement ¶ 55.) Plaintiff and LoFaro complained about the incident to the then-Assistant Superintendent. (Defs.' 56.1 Statement ¶ 57.) Plaintiff believed it was part of her official responsibilities as a teacher to report that the schooner trip was overbooked and

that she and LoFaro did not board the ship. (*Id.* ¶ 59.)

b. Daly Gave out Parent's Addresses in 2005

In May 2005, a letter drafted by Ann Gunther ("Gunther"), a member of the PTA, supporting Board candidate Bob Lee ("Lee") was sent out to all of the SEARCH parents. (*Id.* ¶¶ 61-64.) The letter stated that Lee was "a vital voice for the SEARCH program on the school board committee," and advocated the creation of a SEARCH PTA committee. (*Id.* ¶¶ 66, 67.) Plaintiff did not give out the SEARCH parents' addresses but assumed Daly did. (*Id.* ¶¶ 79, 82.) Plaintiff and LoFaro complained about the letter to the then-Assistant Superintendent. (*Id.* ¶ 88.) Plaintiff believed it was part of her job responsibilities as a teacher to document and report this incident. (*Id.* ¶ 90.)

c. Daly Tutored Students During Summer 2006

Daly tutored students in math during the summer of 2006. (*Id.* ¶ 92.) The students worked on math problems using strategies taught in the STEPS program, which was a program that preceded the Math Olympiad program taught by Daly. (*Id.* ¶¶ 97, 98.) Plaintiff confronted Daly and Daly acknowledged that she tutored students over the summer, but denied that she had done anything wrong. (*Id.* ¶¶ 109, 110.) Defendants contend that there is no written policy against tutoring District students, while plaintiff avers that it was "pretty much out there" that educators are not supposed to tutor or work with students considered to be under their charge. (*Id.* ¶ 112; Pl.'s Counter 56.1 Statement ¶ 112.) Plaintiff and LoFaro complained to the Assistant Superintendent because plaintiff

---

Court from the real issues relevant to Anne's claim, Anne never asserted those minor complaints were constitutionally protected speech. Anne's claims relate only to her speech about (1) Maryann Daly's public support of a specific Board Candidate; (2) Daly's improper tutoring of students for a standardized state entrance exam; (3) the unsafe conditions Daly created during a boating trip; and most importantly, (4) Anne's speech with regards to the future of the SEARCH program." (Pl.'s Opp. Memo. at 7.) Accordingly, the Court need not address these other complaints by plaintiff about Daly because plaintiff has made it clear that they are not part of Kelly's claims in this lawsuit.

believed it was part of her job responsibilities as a teacher to report that Daly tutored students over the summer. (Defs.' 56.1 Statement ¶¶ 116, 118.)

### 3. Plaintiff's Meeting with Barbara Lacey

On February 26, 2009, at 1:00 p.m. plaintiff met with the then-Assistant Superintendent Barbara Lacey ("Lacey") at which time Lacey informed the plaintiff that a recommendation would be made to the Board to eliminate two of the SEARCH teacher positions in the draft budget. (*Id.* ¶¶ 265, 267, 269.) Lacey also informed plaintiff that, although it was not set in stone, her and LoFaro's positions were recommended for elimination. (*Id.* ¶¶ 270, 271.) Plaintiff was told that, if her position with SEARCH was eliminated, she would be reassigned to teach a regular class the following year. (*Id.* ¶ 272.) She was not told that the SEARCH program would be canceled. (*Id.* ¶ 275.) Kelly was told that the possible elimination of the two SEARCH teacher positions was due to budgetary constraints. (Pl.'s Counter 56.1 Statement ¶ 278.1.)[5] Plaintiff acknowledged that the possible reassignment to a regular classroom was not a punishment; however, she contends that it would be a "step down." (*Id.* ¶ 280.1; Defs.' 56.1 Statement ¶ 280.) If plaintiff was reassigned, she would retain the same salary and benefits. (Defs.' 56.1 Statement ¶ 281.)

LoFaro had a similar meeting with Lacey, at approximately 2:00 p.m., on that same day. (*Id.* ¶¶ 283, 284, 285, 286.) At the conclusion of the meeting, LoFaro went directly to plaintiff's classroom. (*Id.* ¶ 290.)

### 4. Plaintiff and LoFaro's Response to the Budget Cuts

Although there was more than one period left of plaintiff's double period SEARCH class when her meeting with Lacey ended, plaintiff did not teach her scheduled SEARCH classes, and instead met with LoFaro to discuss her meeting with Lacey. (*Id.* ¶¶ 291, 292, 294.) Plaintiff and LoFaro decided to gather the SEARCH children and tell them about the information they received from Lacey. (*Id.* ¶ 295.)

### a. The First Meeting at Abrams Elementary School

It is undisputed that plaintiff gathered children from their classes at Abrams Elementary School. (*Id.* ¶ 297, Pl.'s Counter 56.1 ¶ 297.) All of the sixth grade classrooms at Abrams Elementary School are next to each other in the same hallway. (*Id.* ¶ 299.) Plaintiff walked down the hall to all of the sixth grade classrooms and asked the teachers if she could speak with the SEARCH students in their classes. (*Id.* ¶ 300.) Approximately 20 to 22 students left their classrooms and walked down to the end of the hallway and met with plaintiff. (*Id.* ¶ 302, 303, 304.)[6]

The dismissal period begins at 3:03 p.m. (Defs.' 56.1 Statement ¶ 307.) During the dismissal period, children make sure they have all of their books that they will need for their homework and for school the next day. (*Id.* ¶ 298.) There is a dispute as to whether the meeting took place before or during the dismissal period. Defendants contend that the meeting began at approximately 2:45 p.m., that all of the

---

[5] Defendants state that plaintiff understood that the possible elimination of the position was due to budgetary constraints. (Defs.' 56.1 Statement ¶ 278.)

[6] Defendants and plaintiff disagree over whether or not LoFaro was at the first meeting. (Pl.'s Counter 56.1 Statement ¶ 305; Defs.' 56.1 Statement ¶ 305.)

children had dispersed by the time the dismissal announcements started and that the children returned to their classrooms before it was time to be dismissed. (*Id.* ¶¶ 306, 317, 318.) Plaintiff argues that she did not go to the first classroom until sometime during the dismissal period, between 3:03 and 3:10, and that when she sent the students back to their classrooms announcements had just begun. (Pl.'s Counter 56.1 Statement ¶¶ 306, 297.1) Defendants also contend that the meeting lasted five minutes while plaintiff contends that the meeting only lasted a minute to one and one-half minutes. (Defs.' 56.1 ¶ 315; Pl.'s Counter 56.1 Statement ¶ 315.)

Abrams teacher Laraine Schirripa stated that plaintiff asked to see her students "before dismissal" and her class had not been dismissed yet when the SEARCH children returned.[7] (Defs.' 56.1 Statement ¶ 323, 324.) Additionally, Joann Holsclaw, another teacher at Abrams, stated that she teaches right up to the bell and that she continued to teach her lesson when the students returned from the meeting. (*Id.* ¶ 327.)[8] Christina Anderson, another teacher at Abrams, also indicated that she continued teaching after the students returned from the meeting with plaintiff and LoFaro. (*Id.* 330.)[9]

At the meeting, plaintiff told the students that two teachers would be eliminated from SEARCH the following year. (Defs.' 56.1

Statement ¶ 308.) Defendants contend that plaintiff told the students that her and LoFaro would be the teachers eliminated, while plaintiff states that she did not specify which teachers would be eliminated from the program. (*Id.* ¶ 309; Pl.'s Counter 56.1 Statement ¶ 309.) Plaintiff told the students to write to the Board members and to encourage their parents to attend the next Board meeting. (Defs.' 56.1 Statement ¶¶ 310, 311.) According to the defendants, the students reported to their teachers that plaintiff indicated that the entire SEARCH program would be cancelled for the following year and that their younger brothers and sisters would not have SEARCH. (*Id.* ¶ 312.)[10]

Plaintiff believed "it was within [her] right to talk to the children about the changes and to inform the parents who had a similar right to know what was happening." (Pl.'s Counter 56.1 Statement ¶ 320.) Moreover, defendants contend that plaintiff believed it was within her job responsibilities as a SEARCH teacher to speak with the students about the changes to the SEARCH program. (Defs.' 56.1 Statement ¶ 320.)

b. The Second Meeting with Students from Woodhull Elementary School

After plaintiff returned the students to their classes at Abrams Elementary School, she went to her classroom with LoFaro where they discussed going to Woodull Elementary School. (*Id.* ¶¶ 334, 335.) The last period of the day at Woodhull was an extra help period that lasted from 3:00 p.m. to 3:30 p.m. (*Id.* ¶¶ 339, 340.) The period was used to review prior lessons and prepare

---

[7] Plaintiff disputes this fact because she states that Schirripa testified that she could only assume her students had not been dismissed yet. (Pl.'s Counter 56.1 Statement ¶ 324.)

[8] Plaintiff disputes this fact because she states that Holsclaw was only answering about the times when plaintiff took SEARCH students out in general. (Pl.'s Counter 56.1 Statement ¶ 327.1)

[9] Plaintiff disputes this fact because she states that announcements began when she sent the students back to their classrooms. (Pl.'s Coutner 56.1 Statement ¶ 330.)

[10] Plaintiff contends that she did not tell the students that the program would be eliminated or canceled. (Pl.'s Counter 56.1 Statement ¶ 312.)

for standardized tests that were scheduled for the following week. (*Id.* ¶¶ 341, 342.) LoFaro asked one of the secretaries to announce over the P.A. system that she needed to speak with all of the fifth and sixth grade SEARCH students. (*Id.* ¶¶ 343, 344.) Neither LoFaro nor plaintiff got permission from Daly or any other administrator to make the announcement and pull the children out of class. (*Id.* ¶ 345.)[11] LoFaro then walked down the hallway and asked each of the fifth and sixth grade teachers if she could speak with the SEARCH students. (*Id.* ¶ 346.) LoFaro also sent some of the SEARCH students that she already gathered to other classrooms to summon the rest of the SEARCH children. (*Id.* ¶ 348.)

Plaintiff and LoFaro then met with 20 to 25 SEARCH students in the hallway during the extra help period. (*Id.* ¶ 350.) At that time, LoFaro and plaintiff both spoke to the students. (*Id.* ¶ 353.) However, plaintiff notes that she only told the students towards the end of their meeting to have their parents attend the board meeting, while LoFaro told the students that two SEARCH teacher positions would be eliminated. (Pl.'s Counter 56.1 Statement ¶¶ 353.1, 354.) LoFaro also told the students that her own position had been eliminated and that she did not know if there would be a SEARCH program the following school year or if their younger brothers and sisters would have SEARCH. (Defs.' 56.1 Statement ¶¶ 356, 357.) Plaintiff contends that the meeting only lasted one minute to one and one-half minutes, defendants assert that the meeting lasted several minutes. (*Id.* ¶ 358; Pl.'s

Counter 56.1 Statement ¶ 358.) The students were very upset and some even cried after the meeting. (*Id.* ¶¶ 359, 360.)

During the time that plaintiff and LoFaro took the students out of their classes, teachers Cinzia Reeves, Christine Barresi, Marilyn Broomer, Susan Curtin, Susan Danzig, Keith Meyers, and Elaine Mckeown were teaching lessons in preparation for the New York State Assessment test. (*Id.* ¶¶ 375, 379, 385, 390, 395, 401, 403.) Upon the students return, some of the teachers reported having to refocus the children or abandon their lesson completely because the students were very upset and believed that the SEARCH program was going to be canceled. (*Id.* ¶¶ 373, 378, 381, 382, 383, 386, 387, 389, 392, 393, 394, 397, 398, 399, 400, 404, 405.) Keith Meyers and Elaine McKeown continued their lessons after the students returned from their meeting with plaintiff and LoFaro. (*Id.* ¶¶ 402, 406.) LoFaro acknowledged that the teachers were reviewing for the New York State Assessment test at the time she and plaintiff pulled the students from their classrooms. (*Id.* ¶ 407.) Teacher Diane Grassie was in the middle of preparing her students for the school's annual "Pasta Dinner" fundraiser when the students were pulled out of class. (¶ 370.) This was the only time she had set aside to prepare the students for the event. (*Id.* ¶ 371.)

c. Plaintiff and LoFaro Send Emails and Letters to SEARCH Students' Parents

On February 27, 2009, plaintiff emailed a parent of a student in the SEARCH program, despite the fact that Daly previously told plaintiff not to. (*Id.* ¶ 408.) Plaintiff contends that she did not believe she was violating Daly's directive because she thought the directive was related specifically to the PTA survey and not

---

[11] Plaintiff notes that she previously pulled students out of class to talk to them about things related to the SEARCH program without needing to obtain permission. (Pl.'s Counter 56.1 Statement ¶ 345.1.) Plaintiff also noted that she was not involved with the announcement because these were not her students. (*Id.*)

related to the budget and its effect on the SEARCH program. (*Id*. ¶ 408.1.)

On March 2, 2009, despite Daly's directive, and with plaintiff's knowledge, LoFaro distributed another letter by sending it home with four of her fourth grade students stating that plaintiff and LoFaro's positions in the program had been eliminated. (*Id*. ¶¶ 412, 413, 415.)

### 5.    The Aftermath

After the meetings at the two elementary schools, Daly received emails from parents of students in the SEARCH program who believed that the entire program had been eliminated. (*Id*. ¶ 410.) At least one parent expressed a concern that "the children are being used as pawns in a political argument that should be among adults." (*Id*. ¶ 411.)[12]

Woodhull Principle Dr. Kenneth Card ("Card") conducted an investigation regarding plaintiff and LoFaro's actions on February 26, 2009. (*Id*. ¶ 416.) The investigation revealed that the Woodhull incident occurred at approximately 3:10 p.m. during the extra help period. (*Id*. ¶ 417.) The teachers indicated that they were conducting lessons in preparation for the New York State Assessment test. (*Id*. 418.) The teachers also reported that SEARCH children indicated that plaintiff and LoFaro told them that SEARCH had been cancelled and that the students were upset.[13] (*Id*. ¶¶ 419, 420.)

Dr. Card met with LoFaro on March 3, 2009 to discuss the events of February 26, 2009. (*Id*. ¶ 421.) At the meeting, LoFaro stated that her and plaintiff met with students at Abrams and Woodhull and admitted that they met with the Woodhull students at approximately 3:10 p.m. which was in the middle of the extra help period. (*Id*. ¶¶ 423, 424.) Card told LoFaro that her decision to inform the students about this matter was unprofessional and LoFaro admitted that her decision to pull students out of class was in poor judgment. (*Id*. ¶¶ 425, 427.) Card also informed LoFaro that he had received complaints from parents that her and Kelly's actions had upset their children. (*Id*. ¶ 426.)

On March 4, 2009, plaintiff met with Abrams Principle Mary Stokkers ("Stokkers") to discuss the events of February 26, 2009. (*Id*. ¶ 429.) Defendants contend that at the meeting plaintiff told Stokkers that she pulled her SEARCH students out of their classes prior to dismissal and that she informed the students that her position as a SEARCH teacher was being eliminated from the following year's budget and that there would be no SEARCH program the following year. (*Id*. ¶¶ 430, 431.) Plaintiff, however, disagrees and asserts that she only told the children that there would be changes to the SEARCH program. (Pl.'s Counter 56.1 Statement ¶ 431.) Both parties agree that plaintiff told Stokkers that she also told the children to relay the message to their parents, to write the Board, and to attend the next Board meeting. (Defs.' 56.1 Statement ¶ 432.)

District teachers Barresi, Broomer, Curtin, Danzig, Meyers, Anderson, McKeown, Grassi, Reeves and Schirripa provided written statements to the District detailing how plaintiff and LoFaro's actions disrupted their classes that day. (*Id*. ¶ 435.)

---

[12] Defendants contend that parents expressed this concern, while plaintiff states that it was only one parent. (Defs.' 56.1 Statement ¶ 411, Pl.'s Counter 56.1 Statement ¶ 411.)

[13] Plaintiff notes that the children also indicated that they were told to encourage their parents to attend the next board meeting and that both the students and that the parents should write letters to the Board. (Pl.'s Counter 56.1 Statement ¶ 419.1.)

The statements indicated that the teachers were in the middle of lessons when the children were pulled from their classes. (*Id.* ¶ 436.) The statements also indicated that the children stated that the SEARCH program had been cancelled and that the children were very upset. (*Id.* ¶ 437.)

6.      3020-a Charges Against Plaintiff

Plaintiff and LoFaro were informed that New York Education law 3020-a charges would be brought against them for their actions on February 26, 2009. (*Id.* ¶ 442.) Defendants contend that plaintiff hired an attorney after being notified that charges may be brought. (*Id.* ¶ 443.) Plaintiff disputes this fact and alleges that originally she was told that charges may be brought, and not that they were definitely being brought against her. (Pl.'s Counter 56.1 Statement ¶ 443.) According to plaintiff, the District attempted to settle with plaintiff and LoFaro and when they did not accept their offer and retained an attorney, charges were officially brought against them. (*Id.* ¶¶ 443.1, 443.2.)  On May 11, 2009, plaintiff and LoFaro were charged under N.Y. Education Law 3020-a with conduct unbecoming a teacher, neglect of duty, and insubordination for pulling students out of their classes during instructional time on February 26, 2009, and for contacting the SEARCH parents about elimination of their positions after being instructed not to. (Defs.'s 56.1 Statement ¶ 444.)

7.      Plaintiff's Retirement

In December 2007, plaintiff informed the District that she would consider retiring at the end of the 2008-2009 school year if a retirement incentive was offered. (*Id.* ¶ 451.)  In March 2008, plaintiff indicated that she was considering retiring in June 2008 and, in January 2009, plaintiff

indicated that it was possible that she would retire at the end of the 2008-2009 school year. (*Id.* ¶¶ 452, 453.)  During the spring of 2009, plaintiff heard that the District was offering a retirement incentive and decided to retire after the retirement incentive was offered. (*Id.* ¶¶ 454, 455.)  Plaintiff retired at the end of the 2008-2009 school year and, pursuant to the retirement incentive, she received an additional $42,500.00. (*Id.* ¶¶ 456, 457.)

8.      Reconfiguring of SEARCH

The SEARCH program was not entirely eliminated in the budget cuts. (*Id.* ¶ 458.) The program was reconfigured and the library and media specialists were utilized to teach the second and third grade students. (*Id.* ¶¶ 459, 460.)  The reconfiguration was a solution to save the jobs of the library and media specialists who would have otherwise been laid off with the budget cuts. (*Id.* ¶ 461.)

B. PROCEDURAL HISTORY

On May 15, 2009, plaintiff filed the instant action. Defendants moved to dismiss the complaint on September 18, 2009.  The matter was fully submitted and oral argument was held. This Court denied defendants motion in its entirety in a Memorandum and Order, dated December 23, 2009.

Defendants moved for summary judgment on June 10, 2011. On July 28, 2011, plaintiff filed her opposition papers. On August 30, 2011, defendants filed their reply.   Oral argument was held on November 3, 2011.  The Court has fully considered the submissions and arguments of the parties.

## II. SUMMARY JUDGMENT STANDARD

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S. Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. DISCUSSION

As stated *supra,* plaintiff brings her claim of retaliation pursuant to Section 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).[14] For claims under

---

[14]   Specifically, Section 1983 provides:

Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).

Here, for the purposes the motion, the parties do not dispute that defendants were acting under color of state law. The question presented, therefore, is whether defendants' conduct deprived Kelly of the rights she asserts under the First Amendment. Specifically, plaintiff claims that she was retaliated against for (1) complaining about Daly, and (2) calling students out of the classroom at two different schools to discuss anticipated changes to the SEARCH program.

The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008). Where, as here, a public employee brings a retaliation claim based on the First Amendment, a plaintiff must put forth evidence that demonstrates the following in order to establish a prima facie case: "(1) [she] engaged in constitutionally protected speech because [she] spoke as [a] citizen[]

on a matter of public concern; (2) [she] suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008). However, defendants may still "escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Id.* The latter is known as the "*Pickering* balancing test" and is a question of law for the Court. *See Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (referring to *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Even if the government prevails on the *Pickering* test, plaintiff may still succeed by showing that the adverse action was in fact motivated by retaliation and not by any fear of a resultant disruption. *See Reuland v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006).

With regards to plaintiff's claim that she was retaliated against because of her complaints about Daly, defendants argue that there is no genuine issue of material fact as to (1) whether plaintiff spoke as a citizen on a matter of public concern, and (2) whether there was an adverse action taken that can causally be connected to plaintiff's speech. On the issue of plaintiff's claim that she was retaliated against for speaking to the students about the SEARCH program, defendants argue that there is no genuine issue of material fact as to (1) whether plaintiff spoke as a citizen on a matter of public concern, (2) whether the adverse action taken against plaintiff causally related to her speech, and (3) whether, if plaintiff's

---

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

42 U.S.C. § 1983.

speech was protected, it could survive the "*Pickering* balancing test."

As set forth below, after careful consideration of the record under the applicable summary judgment standard, the Court concludes that plaintiff is unable to establish a prima facie First Amendment retaliation claim as a matter of law. Specifically, the Court concludes that the speech at issue in this lawsuit is not protected by the First Amendment because, under the legal framework established by the Supreme Court and the Second Circuit, plaintiff was speaking as a public employee, rather than a citizen. Moreover, in the alternative, with regard to plaintiff's claim that she was retaliated against because she complained about Daly, the Court concludes that no rational jury could conclude that the alleged transfer from a SEARCH teach position to a regular teaching position is an adverse employment action. Finally, in the in alternative, with respect to plaintiff's complaints about Daly, the Court also concludes that no rational jury could find that there was a causal connection between her speech and the decision to transfer her from a SEARCH teacher to a regular teacher. Accordingly, the Court grants defendants' motion for summary judgment in its entirety.[15]

### A.   Speech as a Citizen

As the Second Circuit emphasized, "[i]t is established law in this Circuit that, '[r]egardless of the factual context, we have required a plaintiff alleging retaliation to establish speech protected by the First Amendment.'" *Sousa v. Roque*, 578 F.3d

164, 169-70 (2d Cir. 2009) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)). More specifically, "[t]o determine whether or not a plaintiff's speech is protected, a court must begin by asking 'whether the employee spoke as a citizen on a matter of public concern.'" *Id.* at 170 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). It is critical to note that this test contains two separate requirements – namely, (1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern. If either of these requirements are not met, then plaintiff's First Amendment retaliation claim must fail as a matter of law. *Id.* ("If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'" (quoting *Garcetti*, 547 U.S. at 418)).[16]

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the United States Supreme Court

---

[15] Given the Court's conclusion that summary judgment in defendant's favor is warranted on the above-referenced grounds, the Court need not address defendants other arguments in support of its summary judgment motion.

[16] In *Sousa*, the Second Circuit reiterated, on the issue of whether the speech addresses a matter of public concern, that "a speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern." 578 F.3d at 170. Thus, the Court held that "the District Court erred in its determination in this case that Sousa's speech did not address a matter of public concern because he was motivated by his employment grievances." *Id.* at 174. Instead, "[w]hether or not speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record, and while motive surely may be one factor in making this determination, it is not, standing alone, dispositive or conclusive." *Id.* at 175 (quotations and citations omitted). However, as noted above, this Court need not address the "matter of public concern" requirement in the instant case because the undisputed facts demonstrate as a matter of law that plaintiff was not speaking as a citizen, but rather as an employee pursuant to her official duties, in connection with the speech at issue in the instant case.

clarified the threshold inquiry for a First Amendment retaliation claim in the public employment context. To determine whether the speech at issue is constitutionally protected, the court must first decide whether the plaintiff was speaking as a "citizen," rather than as a public employee. *Id*. at 421. "If the answer is 'no,' then no First Amendment claim arises, and that ends the matter." *Caraccilo v. Vill. of Seneca Falls*, 582 F. Supp. 2d 390, 405 (W.D.N.Y. 2008). In *Garcetti*, the Supreme Court explained that

> [r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

547 U.S. at 421-22. By expressly holding that speech pursuant to a public employee's official duties is not insulated from employer discipline, *Garcetti* emphasized the dual nature of the threshold inquiry into the status of speech; it first directs a court's attention to the role that the speaker occupied, requiring that "before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of [his] public job." *Mills v. City of Evansville*, 452 F.3d 646, 647 (7th Cir. 2006); *see also Benvenisti v. City of N.Y.*, No. 04 Civ. 3166 (JGK), 2006 WL 2777274, at *7 (S.D.N.Y. Sept. 23, 2006) ("First, the Court must determine whether the plaintiff was speaking as a 'citizen' for First Amendment purposes. After that, the Court must turn to the traditional [*Connick v. Myers*, 461 U.S. 138 (1983)] analysis and ask whether,

viewing the record as a whole and based on the content, context, and form of a given statement, the plaintiff's speech was made as a citizen upon 'matters of public concern.'" (internal citations omitted)).

*Garcetti*, however, did not "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." 547 U.S. at 424. In that case, there was no dispute that the plaintiff, a deputy district attorney and calendar deputy with certain supervisory responsibilities over other lawyers, wrote the memorandum at issue, which recommended dismissal of a case based on misrepresentations found in an affidavit, pursuant to his employment duties. *Id*. at 421; *accord Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 (9th Cir. 2008). Although the Supreme Court did not set forth specific criteria for determining when speech is made pursuant to an employee's officials duties, it instructed that the inquiry "is a practical one[,]" because "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424-25. It also noted that speech by a public employee retains some possibility of First Amendment protection when it "is the kind of activity engaged in by citizens who do not work for the government." *Id*. at 423. To illustrate its point by way of comparison, *Garcetti* "also list[ed] examples of prototypical protected speech by public employees, namely 'mak[ing] a public statement, discuss[ing] politics with a coworker, writ[ing] a letter to newspapers or legislators, or otherwise speak[ing] as a citizen.'" *Davis v. McKinney*, 518 F.3d 304,

312 (5th Cir. 2008) (quoting *Spiegla v. Hull*, 481 F.3d 961, 967 (7th Cir. 2007)).

Since *Garcetti*, some lower courts have developed more guidelines for determining whether speech is made pursuant to a public employee's official duties.  Although none of the following factors are dispositive, they may be considered by the Court: the plaintiff's job description; the persons to whom the speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment.  *See Caraccilo*, 582 F. Supp. 2d at 405.  As indicated by *Garcetti*, two relevant factors that, considered in isolation, are not dispositive are whether the speech occurs in the workplace and whether the speech concerns the subject matter of the employee's job.  *See* 547 U.S. at 420-21; *accord Abdur-Rahman v. Walker*, 567 F.3d 1278, 1282 (11th Cir. 2009).  Again, in general, "[a]lthough there is no simple checklist or formula by which to determine whether the employee was speaking as a private citizen or as a public employee . . . 'the cases distinguish between speech that is the kind of activity engaged in by citizens who do not work for the government and activities undertaken in the course of performing one's job.'"  *Caraccilo*, 582 F. Supp. 2d at 410 (quoting *Davis*, 518 F.3d at 312-13) (additional quotation marks and citation omitted).

As set forth below, after careful consideration of the underlying undisputed facts, the Court concludes that plaintiff's speech at issue, both her complaints about Daly and her speech to the students, was unquestionably made in her capacity as a teacher, not as a citizen.  Consequently, plaintiff's speech does not fall within the ambit of First Amendment protection and

summary judgment is warranted in defendants' favor.[17]

### 1. Plaintiff's Speech Complaining about Daly was Made as a Teacher

The speech at issue by plaintiff relating to Daly is based upon complaints by plaintiff about Daly in connection with the following three specific incidents: (1) Daly's alleged improper support of a specific Board candidate by giving out parents' addresses, (2) Daly's alleged improper tutoring of a student in violation of school policy, and (3) allegedly unsafe boating conditions on a

---

[17]  To the extent that it is unclear whether this issue is a question of law for the Court or a mixed question of law and fact in part for a factfinder, that uncertainty does not impact the analysis herein.  *Compare, e.g., Caraccilo*, 582 F. Supp. 2d at 412 (stating that the issue is ultimately a matter of law but that underlying factual issues preclude summary judgment) *with Mulcahey v. Mulrenan*, No. 06 Civ. 4371 (LBS), 2008 WL 110949, at *4 (S.D.N.Y. Jan. 3, 2008) (following the guidance in *Connick*, 461 U.S. at 148 n.7, that "the inquiry into the protected status of speech is one of law, not fact"); *see generally Posey*, 546 F.3d at 1127-29 (discussing the split among circuit courts as to whether this issue is one of law (as determined by the Fifth, Tenth, and D.C. Circuits) or one of mixed law and fact (as determined by the Third, Seventh, Eighth, and Ninth Circuits)).  The Second Circuit also recently noted that "[w]hether the employee spoke solely as an employee and not as a citizen is also a largely a question of law for the court."  *Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011).  Here, the issue of whether plaintiff spoke as a citizen or a public employee is clearly a matter of law for the Court because no factual disputes exist in this case regarding the underlying content of Kelly's speech, her job responsibilities, or the other factors relevant to the question of whether she spoke as a citizen or an employee.  In fact, the Court notes that, at oral argument, plaintiff's counsel confirmed that plaintiff's position was that there were no disputed facts as it relates to the *Garcetti* issue.  In particular, although counsel noted that there was a factual dispute regarding the timing and alleged disruptive impact of plaintiff's speech to the students, he made clear that that factual dispute had no impact on the *Garcetti* analysis, but rather would only pertain to the *Pickering* balancing.

school trip.  Plaintiff argues that, although she believed that it was part of her job responsibilities as a teacher to report these incidents and concerns, it was not actually her duty to report these incidents. Moreover, plaintiff argues that these complaints were the type of speech that would be made by engaged citizens who do not work for the government.  Thus, plaintiff contends this was speech as a private citizen that is protected under *Garcetti*.  However, as discussed below, the Court disagrees and concludes, after analyzing the undisputed facts under the *Garcetti* factors, that plaintiff's speech regarding her complaints about Daly were made in her capacity as a teacher, rather than a private citizen.

First, all three of plaintiff's complaints about Daly were made pursuant to her responsibilities and official duties as a teacher.  Although defendant has not pointed to an official policy that requires a teacher to report such incidents, the Second Circuit has made clear that "under the First Amendment, speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010); *accord Nagle v. Marron*, 663 F.3d 100, 106-07 (2d Cir. 2011).  In *Weintraub*, a public school teacher complained to his supervisor and filed a grievance regarding how a student was not properly disciplined.  593 F.3d at 199.  The Second Circuit held the speech was made by the teacher as an employee, not as a citizen for First Amendment purposes and, thus, was not protected under *Garcetti*. *Id*. at 203. In reaching this decision, the Court emphasized that the grievance was pursuant to the teacher's official duties because it was "'part-and-parcel of his concerns' about his ability to 'properly execute his duties,' [], as

a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.'" *Id*. at 203 (quoting *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)). Here, even though there may have been no written, formal, policy regarding plaintiff's particular complaints, it is clear that such complaints were "part-and-parcel" of her job as a teacher.  In fact, Kelly conceded in her deposition that she reported this conduct by Daly because she believed it was part of her responsibilities as a teacher to document and report on such incidents.

In particular, with regard to the school trip, Kelly admits that she complained to the Assistant Superintendent because she believed that it negatively affected her ability to give a follow-up lesson, she believed Daly's acts violated district policy regarding the student-ratio for field trips, and she had no way of knowing whether being left behind endangered the safety of her students, whose safety she was ultimately responsible.  (Pl.'s Counter 56.1 Statement ¶ 55.)  Although plaintiff argues that making her complaint was not "part-and-parcel" of her job responsibilities as a teacher, it clearly was.  Being able to effectively teach a lesson and ensure student safety are "indispensable prerequisite[s] to effective teaching and classroom learning." *See Weintraub*, 593 F.3d at 203. Accordingly, her complaint regarding the school field trip was "part-and-parcel" of her job responsibilities as a teacher.  *See, e.g.*, *Massaro v. Dep't of Educ.*, No. 08 Civ. 10678 (LTS)(FM), 2011 WL 2207556, at *3 (S.D.N.Y. June 3, 2011) ("The undisputed factual record here demonstrates that Plaintiff's complaints regarding the sanitary conditions in her classroom and the health concerns that arose from them were made pursuant to her duties as an

employee. . . . Communications of concerns about such matters are, thus, part and parcel of a teacher's duties as a public employee and do not enjoy First Amendment protection."). Moreover, because Kelly believed that Daly may have been violating District policy, she acted as a public employee who "air[ed] a complaint or grievance, or expresse[d] concern about misconduct." *See Weintraub*, 593 F.3d 196, 219 (2d Cir. 2010). Accordingly, the complaint regarding the school field trip was pursuant to her job duties as a public employee.

Kelly's complaint about Daly's improper tutoring was also pursuant to her duties as a teacher because it was also a complaint aired over concern about teacher misconduct involving a violation of school policy. Although there was no written policy about tutoring students, Kelly believed that educators were not supposed to tutor students that were under their charge. (Pl.'s Counter 56.1 Statement ¶ 112.) Accordingly, she lodged her complaint because she believed that Daly was not conducting herself appropriately. Similarly, Kelly's complaints regarding Daly's act of giving out parents' addresses in order to support a Board candidate was pursuant to her duties as a teacher. In particular, that type of complaint is also within the responsibilities of a teacher to report because it relates to improper use of student information. Kelly conceded this in her deposition. Accordingly, the first factor – namely, whether the speech in question relates to the plaintiff's job description – favors a finding of speech as a public employee in this case despite the fact that there is no written duty requiring her to lodge her complaint.

Moreover, the second factor – that is, the person whom the speech was directed – also

weighs in defendants' favor because plaintiff directed her speech at the school administration, who were her supervisors, rather than the news media or third parties outside the school. Plaintiff attempts to argue that her speech was private because it is "the kind of activity engaged in by citizens who do not work for the government." In support of that position, Kelly contends that because she went directly to the school principals rather than through a formal process to report Daly, she acted as any private citizen or concerned parent would. However, plaintiff has failed to provide any support for her position that in order for a complaint by a public employee to be public speech an employee must use a formal grievance process, nor is the Court aware of any such authority. Moreover, even though no "formal" process was followed, plaintiff admitted that she "followed the proper chain of command in reporting the incident to the Assistant-Superintendent and the school principals." (Pl.'s Counter 56.1 Statement ¶¶ 58.1, 89.1, 116.) Additionally, plaintiff has admitted herself that she believed it was part of her job responsibilities to lodge her complaints with the principals and Assistant-Superintendent. (Pl.'s Counter 56.1 Statement ¶¶ 59, 90, 118.) Accordingly, by directing her complaints to the school principals and Assistant-Superintendent, the second factor supports the conclusion that her speech was as a public employee, not a private citizen.

In addition, the third factor – whether the speech resulted from knowledge gained through plaintiff's employment – weighs in the defendants' favor. It is undisputed, as confirmed at oral argument, that Kelly only had knowledge of these events and issues because of her position as a teacher in the SEARCH program. Had Kelly not been a SEARCH teacher she: (1) would not have

been involved in the planning of the school trip, (2) would not have cause to believe that Daly distributed parents' addresses, and (3) would not have known that Daly was tutoring students. Accordingly, Kelly was only able to complain about Daly's acts because of the information she obtained as a public employee.

Thus, it is clear that, although no single factor is dispositive, taken together, the undisputed facts clearly demonstrate under *Garcetti* that Kelly was speaking as a public employee, rather than a private citizen when she complained about Daly.

### 2. Kelly's Speech to the Students Regarding the Search Program was Made as a Teacher

Similar to plaintiff's complaints about Daly, plaintiff's speech to the SEARCH students is not protected speech under *Garcetti* because she was speaking as a teacher, not as a private citizen.

First, as with the complaints about Daly, plaintiff only had the information she relayed to the students because of her position as a SEARCH teacher. Prior to pulling the students out of their classes, Kelly met with Lacey who informed her that her position as a SEARCH teacher may be eliminated. (Defs.' 56.1 Statement ¶¶ 265-281.) At the time of the meeting with Kelly and Lacey, there is no indication that the potential budget cuts and its effect on SEARCH were public knowledge. Accordingly, Kelly was only privy to the information she relayed to the students because of her position as a SEARCH teacher.

Second, the speech was directed at the students of the SEARCH program. Apart from her position as a SEARCH teacher,

Kelly would have no other reason to speak to these particular students. Moreover, as part of her job duties as a SEARCH teacher, Kelly would periodically remove students from their classes to discuss SEARCH program matters as she did in this case.(Pl.'s Counter 56.1 Statement ¶ 345.1.)

The fact that plaintiff and defendants disagree over what exact time plaintiff took the students out of their classes at Abrams is of no consequence. Not only did the meeting with the Abrams students take place on school grounds, the students were pulled out of their classes. Viewing the facts in the light most favorable to the plaintiff, plaintiff and LoFaro took the SEARCH students out of their classes at Abrams Elementary School sometime between 3:03 p.m. and 3:10 p.m. during the dismissal period. However, the dismissal period is still a part of the school day. Both the plaintiff and the defendants agree that dismissal is a time when students are at school and in their classes. (Defs.' 56.1 Statement ¶ 298.) During the dismissal period, children make sure they have everything they need to complete their homework for the next day and prepare to leave the school. (*Id.*) Thus, it can be inferred that while an actual lesson may not be taking place, a student is still under the charge of her teacher during the dismissal period and that dismissal is a part of the school day.

Moreover, it is clear that that the second meeting at Woodhull took place during the school day. Plaintiff has acknowledged that the extra help period that the students were pulled out of is used for extra help or, as was the case in most of the classrooms on the day in question, to prepare for standardized tests.(*Id.* ¶¶ 339, 341.)

Therefore, it is clear based on the undisputed facts – namely, that plaintiff

pulled students out of their classes, conducted her speech on school grounds, and discussed matters concerning the SEARCH program that she was privy to because of her position as a SEARCH teacher – that plaintiff spoke as a public employee, and not a private citizen.

In short, applying *Garcetti* to the undisputed facts, the Court concludes that the four items of speech at issue in this case were made by plaintiff as a teacher, not as a private citizen. This Court's determination on this issue is consistent with numerous decisions by the Second Circuit and other courts who have concluded, under analogous circumstances, that these types of *internal* complaints by teachers about student/teacher issues based upon information learned through their jobs – whether it be safety issues, staffing/service issues, violation of school policy, or misuse of school property/information – constitute speech as a public employee, rather than a private citizen, and are not protected by the First Amendment pursuant to *Garcetti*.[18]  *See,*

---

[18] Although not raised by plaintiff, the Court recognizes that, in his dissent in *Garcetti*, Justice Souter raised concerns about the applicability of the *Garcetti* majority decision to "academic freedom in public college and universities." 547 U.S. at 438 (Souter, J., dissenting). In response, the majority left open that narrow issue for another day. *See id.* at 425 (majority opinion) ("Justice Souter suggests today's decision may have important ramifications for academic freedom. . . . We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."); *see also Panse v. Eastwood*, 303 F. App'x 933, 934 (2d Cir. 2008) ("[i]t is an open question in this Circuit whether *Garcetti* applies to classroom instruction"). That narrow issue is not implicated here. The speech at issue here, in an elementary school, related not to academic freedom or the substance of classroom instruction, but rather issues of safety, teacher staffing, misuse of school information, and violation of school policy. Thus, any potential exception to *Garcetti* for cases centered on academic freedom has no applicability here.

*e.g.*, *Weintraub*, 593 F.3d at 203-04 (teacher's complaint about administration's refusal to discipline student not protected); *Woodlock v. Orange Ulster B.O.C.E.S.*, 281 F. App'x 66 (2d. Cir. 2008) (complaints to supervisor about lack of classes for special education students not protected); *Panse v. Eastwood*, 303 F. App'x 933, 934-35 (teacher's statements to students encouraging them to participate in a for-profit course he was considering teaching outside of school was not protected); *Renken v. Gregory*, 541 F.3d 769, 774-75 (7th Cir. 2008) (professor's criticism of misuse of grant funds not protected); *Battle v. Bd. of Regents*, 468 F.3d 755, 761 (11th Cir. 2006) (university employee reporting alleged improprieties in her supervisors handling and management of federal financial aid funds not protected); *Stahura-Uhl v. Iroquois Central School Dist.*, No. 09-CV-784S, 2011 WL 6330052, at * 5-9 (W.D.N.Y. Dec. 19, 2011) (teacher's complaints to supervisors regarding alleged deprivation of equipment and resources, as well as teacher's complaints to coworkers and students' parents, not protected by First Amendment); *Massaro v. Dep't of Educ*, No. 08 Civ. 10678 (LTS)(FM), 2011 WL 2207556, at *3 (S.D.N.Y. June 3, 2011) (teacher's complaints regarding the sanitary conditions in her classroom not protected); *Adams v. NY State Educ. Dep't*, No.08 Civ. 5996 (VM)(AJP), 2010 WL 624020, at *24-25 (S.D.N.Y. Feb. 23, 2010) (teachers' internal complaints about, *inter alia*, deplorable conditions, unruly students, classroom overcrowding, teacher schedules, were not protected by First Amendment); *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 207 (E.D.N.Y. 2009) ("The substance of Plaintiff's complaints concerning the lack of sufficient educational and instructional resources and the appropriateness of the counseling curriculum are matters relating to

[plaintiff]'s own job responsibilities as an educator and school psychologist, and therefore is unprotected speech."); *Felton v. Katonah Lewisboro Sch. Dist.*, No. 08 Civ. 9340, 2009 WL 2223853 at *5 (S.D.N.Y. July 27, 2009) (plaintiffs spoke pursuant to their official duties as educators where complaints "concerned solely their classroom and their students and were addressed to their direct supervisors" and noting that the case law "recognize[s] that these responsibilities-ensuring that a classroom is well supplied, safe, and conducive to learning and that the curriculum is substantively appropriate-are quintessentially those of a teacher. . . . ."); *Rodriguez v. Int'l Leadership Charter Sch.*, No. 08 Civ. 1012, 2009 WL 860622 (S.D.N.Y. Mar. 30, 2009) (teacher's complaints about lack of services for her students not protected); *Shums v. N.Y.C. Dep't. of Educ.*, No. 04-CV-4589, 2009 WL 750126, at *14-15 (S.D.N.Y. Mar. 17, 2009) (instructor's complaints about classroom size and scheduling not protected).

Accordingly, summary judgment is warranted in defendants' favor on plaintiff's First Amendment retaliation claim, which is the only claim in this case.[19]

### B.   Adverse Employment Action

With respect to the complaints about Daly, the Court also concludes, in the alternative, that summary judgment is warranted because there is no evidence of an adverse employment action from that speech.

"In the context of a First Amendment retaliation claim . . . retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation omitted). "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).[20] However, "lesser actions may also be considered adverse employment actions." *Id.*; *see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." (citing *Bernheim v. Litt*, 79 F.3d 318, 325 (2d Cir. 2002))). Indeed, in the education context, "[a]dverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik*, 464 F.3d at

---

[19]   Because speech as an employee is not protected, the Court need not determine whether the speech involved a matter of public concern, or conduct the *Pickering* balancing analysis. *See, e.g.*, *Jackler*, 658 F.3d at 237 ("If the employee did not speak as a citizen, the speech is not protected by the First Amendment, and no *Pickering* balancing analysis is required."); *Renken v. Gregory*, 541 F.3d at 775 n.3 ("Because Renken's speech was made as an employee and not a citizen, we need not address whether his speech addressed a matter of public concern to determine whether it [sic] not protected by the First Amendment.").

[20]   Recently, in *Lore v. City of Syracuse*, the Second Circuit stated that, "If the adverse-action element of a Title VII retaliation action can be satisfied by an action causing the employee harm outside the workplace, *a fortiori* an act in retaliation for the employee's exercise of a constitutional right need not be tied to harm in the workplace." 670 F.3d 127 (2d Cir. 2012) (analyzing a defendant's entitlement to qualified immunity with respect to plaintiff's Section 1983 claim). In this case, plaintiff has not alleged any adverse action causing a harm outside of the workplace.

226 (quoting *Morris*, 196 F.3d at 110). Additionally, a change in teaching responsibilities can constitute an adverse action if it is "materially less prestigious, materially less suited to [a plaintiff's] skill and expertise, or materially less conducive to career advancement." *Galabaya v. New York City Bd. Of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000) (collecting cases).

Plaintiff contends that she suffered two adverse employment actions: (1) the potential transfer from a SEARCH teacher position to a regular teaching position; and (2) the New York Education Law 3020-a charges for conduct unbecoming a teacher, neglect of duty and insubordination for pulling her students out of class during instructional time on February 26, 2009. Defendants do not dispute that the latter is an adverse employment action but argue that there is no causal connection between the adverse action and Kelly's speech.[21] Defendants also argue that the potential transfer from a SEARCH teacher position to a position as a teacher of a regular elementary classroom was not an adverse employment action. This Court agrees.

Here, the job transfer was a lateral transfer that does not rise to the level of a constitutional violation. *Garber v. N.Y. City Police Dep't*, No. 95 CIV. 2516 (JFK), 1997 WL 525396, at * 4-5 (S.D.N.Y. Aug 22, 1997) *aff'd*, 159 F.3d 1346 (2d Cir. 1998). First, although it is not the sole factor in determining whether or not Kelly was subjected to an adverse employment action, Kelly would receive the same compensation and benefits she received as a SEARCH teacher in her new position. Kelly has also failed to indicate in any way how her position as a regular teacher is less prestigious or how she would be less eligible for advancements in a regular teacher position. She merely states that it was a "step down." Accordingly, simply because Kelly preferred to work with the advanced students did not make her change in position an adverse employment action.

Moreover, although plaintiff argues that plaintiff received a special certificate for working with gifted and talented students, that alone does not indicate that she had a special skill to work with those students. Kelly admitted that she never received "specific" training in the gifted education but received her certificate because she was grandfathered in. (Pl.'s Counter 56.1 Statement ¶ 17.1.) Additionally, while Kelly has taught in the SEARCH program since 1990, she also has a wealth of experience teaching in regular classrooms as her career spanned approximately 30 years, which included Title I math and Title II reading. (*Id.* at 12.) In short, the elimination of Kelly's position as a SEARCH teacher was not an adverse employment action, and no rational juror could find in plaintiff's favor on that issue. Accordingly, summary judgment as it relates to the complaints about Daly is also warranted on this ground.

---

[21] Defendants do not explicitly concede that the Education Law 3020-a charges are an adverse employment action. However, the defendants do not make an argument, either in their motion for summary judgment or in their reply in further support of the motion for summary judgment, that it is not an adverse employment action. Instead, defendants only argue that the Education Law 3020-a charges were not causally connected to Kelly's speech. Accordingly, the Court assumes that the matter is conceded. However, even if the matter was not conceded, the 3020-a charges are clearly an adverse employment action because "the institution of disciplinary proceedings is sufficient in this circuit to constitute an adverse employment decision." *Skehan*, 465 F.3d at 106 (citing *Burkybile v. Bd. of Educ.*, 411 F.3d 306, 313-14 (2d Cir. 2005)), *abrogated on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

C.      Causal Connection

The Court also concludes, in the alternative, that with respect to plaintiff's complaints about Daly, no rational jury could find that there was a causal connection between Kelly's speech and the decision to transfer her from a SEARCH teacher to a regular teacher.

Plaintiff must also demonstrate a "'causal connection . . . sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.'" *Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)). A plaintiff can demonstrate this causal connection "indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (quoting *Morris*, 196 F.3d at 110). Of course, the Court recognizes that the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Co-op. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001), and courts must carefully consider the time lapse in light of the entire record. *See*, *e.g*., *Grant v. Bethlehem Steel Corp*., 622 F.2d 43, 45-46 (2d Cir. 1980) (holding eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson v. N.Y.S. Dep't of Corr. Servs.*, 180 F.3d 426, 446-47 (2d Cir. 1999) (holding abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Moreover, "a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead, he must produce 'some tangible proof to demonstrate that [his] version of what occurred was not imaginary.'" *Cobb*, 363 F.3d at 108 (quoting *Morris*, 196 F.3d at 111 (alteration and internal citation omitted)).

Despite plaintiff's attempts to argue to the contrary, this Court concludes, even construing the evidence most favorably to plaintiff, that no rational jury could find a causal connection between Kelly's complaints about Daly and the decision to potentially change Daly's position from a SEARCH teacher to a regular teacher.

There is simply no evidence, direct or indirect, from which a causal link could rationally be inferred. As detailed *supra*, the schooner ship field trip took place in 2005, the letter drafted by Gunther supporting Lee was sent to SEARCH parents in 2005, and the incident with Daly tutoring students took place in the summer of 2006. The meeting with Lacey in which Kelly was informed that two teaching positions in the SEARCH program may be eliminated took place on February 26, 2009. Accordingly, even if Kelly's complaints were speech by a private citizen on a matter of public concern, the time period between the complaints and the alleged adverse action is approximately two and a half years. Although there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos*, 252 F.3d 545, 554 (2d Cir. 2001), the time between when Kelly made her complaints about Daly

and the time when the meeting with LoFaro took place is too attenuated to suggest that there was a causal connection.[22]

Moreover, plaintiff is unable to point to any evidence of retaliatory animus. Defendants contend that the reason for the change in the program was because of budgetary constraints. Plaintiff also acknowledged that the possible reassignment to a regular classroom was not a punishment. (Pl.'s Counter 56.1 Statement ¶ 280.) Additionally, at plaintiff's deposition, she acknowledged that she understood that the change in the SEARCH program was due to budgetary constraints. At plaintiff's deposition, the following colloquially took place:

Q:  You said you understood that this was a result of some budgetary issues in the district?

A:  Yes.

Q:  Did you have any understanding that there was any other factors besides the budgetary issues in those recommended changes to the SEARCH program?

A.  No.

Q.  That was your understanding that it was just budgetary?

A.  That's what I was told.

Q.  Is that your belief?

A.  Yes.

(Defs.' Ex. D 135:21-15, 136:2-10.)  Thus, not only has plaintiff failed to point to any evidence in the record to support her contention, but her testimony clearly indicates that she understood that the reason for the change in the SEARCH program was due to budgetary constraints.  Apart from her conclusory allegation that the decision to possibly eliminate two SEARCH teacher positions was because of retaliation, plaintiff has failed to set forth any evidence of retaliatory motive.  Thus, no rational juror could find a causal connection between plaintiff's complaints and the decision to possibly eliminate two SEARCH teacher positions.[23]  Accordingly, in the alternative,

---

[22]  Plaintiff attempts to argue that there is a causal link between her complaints and the adverse action of her position potentially being changed because she was subjected to continued harassment.  (Pl.'s Opp. Mem. at 20.)  Plaintiff then points to the instances she previously stated should not be considered by the Court discussed *supra* at n.4, and explains that there is a causal connection between the alleged protected speech and the adverse action because she was subjected to continued harassment.  However, plaintiff has not cited any law that supports her position that a causal connection can be demonstrated by pointing to other speech by the plaintiff that is not the subject of the litigation.  Accordingly, the Court is restricting its analysis to the speech at issue.  However, even if this Court were to consider the tension that existed between Kelly and Daly from 2005 to 2009, as detailed in the parties 56.1 Statements, the Court would still conclude that no rational jury could find a causal connection.  First, although the evidence shows that there may have been disagreements between Kelly and Daly on how to conduct the SEARCH program, there is no indication that Kelly was harassed by Daly.  In fact, the 56.1 Statements indicate that on at least two occasions Kelly's suggestions were implemented by the defendants.  (Pl.'s Counter 56.1 Statement ¶¶ 177, 237.)  Accordingly, no rational juror can find a causal connection between the budgetary cuts and Kelly's complaints about Daly, even accepting all of the facts set forth in the parties' 56.1 Statements.

[23]  To the extent that plaintiff may be implicating a claim that she was retaliated against for retaining an attorney, there is also no evidence to support that in the record.  The record reflects that plaintiff was informed of the possibility of charges being brought against her well before charges were actually imposed. (Defs.' 56.1 Statement ¶ 442.)  Moreover, to the extent plaintiff alleges that her position was

summary judgment on the complaints about Daly also is warranted on this additional ground.[24]

### IV. CONCLUSION

For the reasons set forth herein, defendants' motion for summary judgment is granted in its entirety, and the complaint is dismissed in its entirety.  The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 30, 2012
        Central Islip, New York
                    * * *

The attorney for plaintiff is Steven A. Morelli, Law Office of Steven A. Morelli, P.C., One Old Country Rd., Suite 347, Carle Place, NY 11514.   The attorneys for defendants are Steven C. Stern and Mark A. Radi, Sokoloff Stern LLP, 355 Post Ave., Suite 201, Westbury, NY 11590.

_____
eliminated in response to the February 26, 2009 speech to the students, it is clear that she was informed about the possible elimination of her position before she went to the two elementary schools to speak to the SEARCH students, and accordingly, no causal connection exists.  (*Id*. ¶¶ 265, 269, 270.)

[24] Defendants also argue that there is also no causal connection between plaintiff's speech to the students on February 26, 2009 and the Education Law 3020-a charges.   Defendants' contend that plaintiff was punished for her act of removing students from classroom instruction and not for the actual content of their speech. Defendants also argue that even if plaintiff was able to set forth a prima facie case, plaintiff's speech to the students regarding the SEARCH program would fail the *Pickering* Balancing test.   However, the Court has already determined that the speech is not protected, and accordingly, these additional arguments are moot and the Court need not address them.